Filed 5/28/14  P. v. Overton CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TRAVIS SENTEL OVERTON,<br><br>        Defendant and Appellant. | A140440<br><br>(Solano County<br>Super. Ct. No. VCR212944) |

Appellant Travis Sentel Overton was convicted by jury of two counts of robbery, and the jury found that a principal was armed with a handgun in the commission of these offenses.  Assigned counsel has submitted a *Wende*[1] brief, certifying that counsel has been unable to identify any issues for appellate review.  Counsel has also submitted a declaration confirming that Overton has been advised of his right to personally file a supplemental brief raising any points which he wishes to call to the court's attention.  No supplemental brief has been submitted.  As required, we have independently reviewed the record.  (*People v. Kelly* (2006) 40 Cal.4th 106, 109–110.)  We find no error and affirm.

## I.     BACKGROUND

Overton was charged by amended information with two counts of second degree robbery (Pen. Code, §§ 211, 212.5).[2]  An enhancement under Penal Code section 12022, subdivision (a)(1) (principal armed with a handgun) was alleged as to each count.  An

---

[1] *People v. Wende* (1979) 25 Cal.3d 436.

[2] A codefendant, Rork Parker, was jointly charged.

initial trial resulted in mistrial when the jury was unable to reach a verdict as to Overton.[3] Retrial commenced on September 24, 2013. We recite trial evidence supporting the verdict. (*People v. Hovarter* (2008) 44 Cal.4th 983, 996–997 [entire record is reviewed in the light most favorable to the prosecution to see if " ' " ' "*any* rational trier of fact" ' could have been so persuaded" ' "].)

On June 28, 2011, at about 1:40 p.m., two men wearing black ski masks entered the U.S. Bank in Benicia, California. One of the men held a two-toned, semi-automatic handgun. He pointed the gun at bank tellers S.M. and D.B. He directed a customer to get on the floor. The second masked man leapt over the counter and directed S.M. and D.B. to the bank's vault. He yelled at D.B. to "hurry up, bitch," and threatened to "blow [her] fucking head off." When the vault was opened, the man with the gun pushed D.B. into the vault room. The man who had leapt over the counter took currency and boxes of coins from the vault and put them into a blue bag. The men left the bank and got into a small black SUV which was parked directly in front of the bank. A third person was in the driver's seat of the SUV. Ten surveillance cameras at the bank recorded the incident. The surveillance video was played for the jury.

A witness pulled up to the bank while the incident was occurring and, through the bank's front glass windows, saw a body go across the counter top. Believing a robbery might be in progress, the witness attempted to call police, but was unable to do so. He saw two men in dark clothing come out of the bank and get into a black car which had backed into a parking space in front of the bank. One of the men went into the back of the car, and the other entered a passenger side door. Neither man got into the driver's seat. As the vehicle drove away, the witness took photos of the car and its license plate with his cell phone. When the police arrived at the bank, the witness gave them a description of the car and showed them the photos.

The bank had a global positioning system (GPS) device hidden in bait money in D.B.'s teller drawer. The device was disguised as a bundle of $20 bills. The device was

---

[3] Parker was acquitted.

designed to activate when the bait money was lifted off the tray and to send out a radio frequency signal indicating its location, as well as direction and speed of travel. After D.B. retrieved keys to the vault, she left her teller drawer open, hoping that the suspects would take the money with the hidden tracking device. After the incident, the bundle with the tracking device was no longer in the drawer.

The device was made and monitored by 3SI Security Systems. At 1:43 p.m. on June 28, 2011, an information technology analyst for the Benicia Police Department, received an e-mail notification from 3SI Security Systems regarding a bank robbery in progress. The analyst logged into a GPS tracking system and was able to track the device on a map on a computer screen. The information was updated every 10 to 20 seconds and relayed to the police dispatcher as it was received.

The GPS tracker first went active at 1:41 p.m., indicating that the stolen money was near the Center City in Benicia. Shortly after 1:42 p.m., the device was tracked to Steven Circle in Benicia and became stationary for about 30 seconds. The device then showed movement through Benicia, onto Interstate 780 westbound to Lemon Street in Vallejo, back onto westbound Interstate 780, and onto westbound Interstate 80. At 2:06 p.m., the device became stationary at 2 Alan Court in San Pablo.

At 2:39 p.m., Benicia Police Corporal Mark Hassler went to 334 Steven Circle in Benicia in response to a call about an unoccupied vehicle with its engine running and door open. That location was in a residential area about two- or three-tenths of a mile from the bank. Hassler found a black Honda CRV matching the description and license number given by the witness from the bank parking lot. The rear driver side door of the car was open, the engine was running, and there were $5 bills next to the open door. Hassler checked the license plate and determined that the car had been reported stolen.

At about 12:30 p.m. on the day of the robbery, a Steven Circle resident saw two Black males in their early to mid-20's get out of a green car across the street from her home and then "half-run[]" up the street. She then heard a car door slam. Around 1:45 p.m., she again heard car doors slamming. About 10 or 15 minutes later, she looked

outside and saw that the green car was gone, but that a black SUV was parked near where the green car had been.

Vallejo Police Officers William Badour and Kevin Coelho heard the initial dispatch regarding the bank robbery. They followed the GPS updates to Alan Court in San Pablo, the location where the tracking device had reportedly stopped at 2:06 p.m. Vallejo Police Department logs indicated that the officers arrived on Alan Court at 2:07 p.m. Alan Court is a dead-end street about 100 yards long with apartment buildings on either side. As the officers turned onto Alan Court, Badour saw two Black males getting out of a green Mazda in front of 10 Alan Court. Badour and Coelho identified Overton as the man who exited the driver's door and Parker as the person exiting the passenger side. Both men looked in Badour's direction, and Badour activated the forward facing red light on his patrol car. Both men took off running. Vallejo Police Officer Alan Caragan also responded to Alan Court, arriving at the same time as Badour and Coelho. He also saw Overton get out of the driver's side of the green Mazda and a second man get out of the passenger side of the car. Caragan then saw the men run away. San Pablo Police Officer Mark Galios responded to the area of Alan Court, with his K-9 partner, to search for the suspects. Galios located Overton underneath a wooden outbuilding about 1,500 feet from Alan Court, attempting to cover himself with a wooden board. Galios arrested Overton, who was wearing a long, baggy, dirty, white T-shirt.

An initial search of the green Mazda was conducted before it was towed. A black hooded sweatshirt was found on the back seat. In the center pocket of the sweatshirt, was the GPS tracking device. A blue bag was in the trunk with several denominations of money visible. An evidence technician later collected the black hooded sweatshirt and a solid black scarf/face mask from the back seat. Another black sweatshirt was found in the Mazda's trunk, along with another scarf/face mask, a blue fishnet bag with money in it, and some coin boxes. Money was scattered around the trunk. A total of $6,722 was recovered. The technician took samples for DNA from the steering wheel, knob shifter, and door handles of the Mazda; buccal swabs were collected from Overton and the other suspects.

4

The technician also obtained two partial shoe impressions from the bank counter that one suspect had leapt over. She compared those impressions with the soles of a pair of Nike Air Jordan shoes collected from in front of the holding cell at the Benicia Police Department where Overton was confined. The size and patterns of the prints from the counter were consistent with Overton's shoes. Still photographic prints taken from bank surveillance videos showed the shoes of the person who jumped over the counter were solid white with a blue stripe, had a dark tongue and laces, and had an Air Jordan logo at the back heel. The shoes depicted in the bank video were consistent with the shoes collected from Overton.

Surveillance video also showed that the person who jumped over the counter was wearing a long, white shirt that went below the waist but above the knees, and jeans, consistent with the clothing Overton was wearing when he was arrested. The black sweatshirt found in the Mazda's trunk had white tags on the edge of the hood and pockets, and plastic tabs on the drawstrings, consistent with the sweatshirt of the person seen jumping over the counter in the video.

A California Department of Justice DNA expert analyzed samples taken from one of the scarf/face masks found in the Mazda. Overton could not be excluded as a major contributor. The probability of a random unrelated person being a major contributor was about 1 in 70 million African-Americans, 1 in 6 billion Caucasians, and 1 in 58 billion Hispanics.

Overton called his wife as an alibi witness.

On October 1, 2013, the jury returned verdicts finding Overton guilty of two counts of second degree robbery,[4] and finding true the firearm enhancement. On November 27, 2013,[5] the court sentenced Overton to the midterm of three years on the

---

[4] Count 1 charged a robbery of teller D.B., and count 2 charged a robbery of S.M.

[5] The reporter's transcript of this hearing is dated December 27, 2013, but the clerk's minutes reflect the November date. The sentencing abstract is dated December 2, 2013, and the notice of appeal is dated November 27, 2013, with a file stamp date of December 3, 2013. The November date appears correct.

5

first robbery count, plus one year for the sentencing enhancement, for a total of four years. The court imposed a concurrent three-year term for the second robbery count.[6] All parties agreed that Overton was entitled to custody credits totaling 186 days. Without objection, the court imposed a restitution fine in the amount of $2,500, and a suspended parole revocation fine in an equal amount. Overton filed a timely notice of appeal.

## II.    DISCUSSION

We find no arguable issues. Overton was represented throughout all proceedings by competent counsel. The jury was properly instructed on all issues, including the elements of the charged offenses and enhancement (CALCRIM Nos. 1600 [robbery], 3115 [armed principal]). The direct and circumstantial evidence is more than sufficient to support the verdicts rendered.

The trial court reviewed and considered the probation report (which recommended a prison sentence), sentencing report, mitigation statement presented by Overton, and argument of counsel. The court considered and rejected probation. (Cal. Rules of Court, rule 4.414.) "Probation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court. [Citations.]" (*People v. Pinon* (1973) 35 Cal.App.3d 120, 123.) The court the weighed aggravating and mitigating circumstances in assessing the appropriate prison term. (Cal. Rules of Court, rules 4.410, 4.425.) The choice of the appropriate term rests within the court's sound discretion. (§ 1170, subd. (b); see Cal. Rules of Court, rule 4.420.) No arguable issues are presented as to the fines and penalties imposed, nor as to the custody credits Overton received.

---

[6] A concurrent sentence is permissible. Penal Code section 654 does not apply to crimes of violence against multiple victims. (*People v. Correa* (2012) 54 Cal.4th 331, 341.)

### III. DISPOSITION

The judgment is affirmed.

_____
Bruiniers, J.


We concur:


_____
Simons, Acting P. J.


_____
Needham, J.